UNITED STATES of America, Appellee,

v.

Anthony F. WEBSTER, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Robert A. BOUTHOT, a/k/a Robert H.
Bouthot, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Manuel D. RAVELO, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Warren R. HUNTINGTON,
Defendant, Appellant.

Nos. 94–1720, 94–1721, 94–1722, 94–
1778, 94–1846 and 94–1862.

United States Court of Appeals,
First Circuit.

Heard March 3, 1995.

Decided April 27, 1995.

Thomas F. Hallett, by Appointment of the Court, Portland, ME, for appellant Anthony F. Webster.

F. Mark Terison, Asst. U.S. Atty., with whom Jay P. McCloskey, U.S. Atty., Portland, ME, was on brief, for U.S.

Thomas A. Dyhrberg, by Appointment of the Court, with whom Thomas A. Dyhrberg, P.A. South Portland, ME, was on brief, for appellant Robert A. Bouthot.

Margaret D. McGaughey, Asst. U.S. Atty., with whom Jay P. McCloskey, U.S. Atty., and George T. Dilworth, Asst. U.S. Atty., Portland, ME, were on brief, for U.S.

James R. Bushell, by Appointment of the Court, with whom Law Office of James R. Bushell, Portland, ME, was on brief, for appellant Manuel D. Ravelo.

F. Mark Terison, Asst. U.S. Atty., with whom Jay P. McCloskey, U.S. Atty., and George T. Dilworth, Asst. U.S. Atty., Portland, ME, were on brief, for U.S.

Jeffrey M. Smith, by Appointment of the Court, with whom Peters, Smith & Moscardelli, Boston, MA, was on brief, for appellant Warren R. Huntington.

Michael M. DuBose, Asst. U.S. Atty., with whom Jay P. McCloskey, U.S. Atty., Portland, ME, and Raymond Hurley, Asst. U.S. Atty., Washington, DC, were on brief, for U.S.

Before BOUDIN, Circuit Judge, CAMPBELL, Senior Circuit Judge, and JOHN R. GIBSON,* Senior Circuit Judge.

BOUDIN, Circuit Judge.

Anthony Webster, Robert Bouthot and Manuel Ravelo were convicted of various drug offenses stemming from their involvement with a cocaine distribution ring centered in Portland, Maine; Warren Huntington was convicted of three offenses arising from an unrelated bank fraud scheme. The four were sentenced to prison terms ranging from 30 to 188 months, and each now challenges his sentence.

## I. Webster

On December 3, 1993, Webster pled guilty to eight separate offenses, including the use of a firearm during a drug trafficking crime. The guideline sentencing range for all offenses but the firearm offense was calculated to be 63 to 78 months. By statute the firearm offense carried a mandatory minimum sentence of 60 months to run consecutively to any other sentence imposed. *See* 18 U.S.C. § 924(c).

Before sentencing the government moved for a downward departure from the guideline sentencing range in recognition of Webster's cooperation and testimony in prosecuting the other members of the drug conspiracy. The government's motion for departure invoked U.S.S.G. § 5K1.1 and thus, according to the government, sought a downward departure for the guideline offenses only. *See* U.S.S.G. § 5K1.1 (allowing departure from guidelines on government's motion). The government did not request a downward departure under 18 U.S.C. § 3553(e) from the statutory mandatory minimum for the firearm offense.

At sentencing, Webster did not request the court to depart below the 60-month sentence for the firearm offense, believing that the court lacked the authority to do so because the government had not moved under section 3553(e). Instead, Webster pressed the court to award a proportionate reduction of his total sentence—subject to a 60-month floor—and not just the portion of his sentence governed by the guidelines. Webster then argued for an overall sentence of 72 to 78 months.

The district court responded that this "defeats the whole purpose of the statutory mandatory minimum" and that it had to "set that aside" for purposes of determining a downward departure of the guideline sen-

* Of the Eighth Circuit, sitting by designation.

**4**

tence. The district court then sentenced Webster to a total of 90 months: 60 months for the firearm offense and 30 months for the other offenses, to run consecutively. The 30–month sentence represented more than a 50 percent reduction in the guideline minimum of 63 months for those offenses.

On appeal, as in the district court, Webster challenges only the district court's refusal to consider his entire sentence when deciding how far to depart on the *guideline* offenses. Consequently, we need not decide whether the government's motion under U.S.S.G. § 5K1.1 would have triggered the court's authority under 18 U.S.C. § 3553(e) to depart below the statutory minimum, an issue that has divided the circuits. *Compare United States v. Wills*, 35 F.3d 1192 (7th Cir. 1994), *with United States v. Sanchez*, 32 F.3d 1330 (8th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1119, 130 L.Ed.2d 1082 (1995). *See also Wade v. United States*, 504 U.S. 181, 182, 112 S.Ct. 1840, 1843, 118 L.Ed.2d 524 (1992) (noting circuit split).

■ The government has moved to dismiss Webster's appeal on the ground that we lack jurisdiction to review the extent of a district court's departure from the guideline sentencing range. We do normally lack jurisdiction over such a challenge, because the extent of any permitted departure is left to the district court's discretion. *United States v. Pighetti*, 898 F.2d 3, 4 (1st Cir.1990). But where the departure may have been affected by a mistake of law, as Webster alleges here, appellate jurisdiction exists. *See United States v. Mariano*, 983 F.2d 1150, 1153 (1st Cir.1993).

To decide this case without adopting a position on the issue that divides the circuits is somewhat artificial. For if the Seventh Circuit view were followed, the district court would have power to depart even as to the mandatory minimum. But we do not want to take sides here on the larger issue which has neither been briefed nor argued. Thus, solely for purposes of this case, we assume *arguendo* (as the district court did without that qualification) that the government's failure to ask for a departure from the statutory minimum did prevent the district court from departing to a point below that figure.

On that assumption, we agree that the district court's position has considerable force: any reduction of a guideline sentence to offset even in part a consecutive statutory minimum tends to undercut Congress' insistence on the statutory minimum. At the same time, Congress has given the sentencing court almost unreviewable discretion to decide the amount of the departure after a 5K1.1 motion. To tell the district court that it must ignore *any* factor that may seem logically relevant arguably collides with this intention.

■ We conclude that in departing from a guideline sentence the district court is free to exercise its own judgment as to the pertinence, if any, of a related mandatory consecutive sentence. Should the district court think that the latter has some role along with other factors in fixing the extent of a guideline departure in a particular case, that is within its authority; and should that court decline to consider the mandatory minimum in fixing the other sentence, that too is within its authority. For this court to decide upon the ingredients of a departure one by one would go very far toward defeating discretion.

■ We are confident that this difference in perspective had no impact on the sentence in this case. Assuming that the statutory minimum sentence fixed a floor, the district court was free not to consider the statutory minimum in fixing the guideline sentence. We have no reason whatever to think that the district court would have altered its position, which rests on a rational policy judgment, if it had been told that this choice was a matter of its discretion and not of law.

Still less do we have any reason to think that the district court's sentence would have been less if it had considered the mandatory minimum sentence. The district court said that the large departure it granted was based on the scope of Webster's cooperation and the resulting benefit to the government. It went on to say that this reduction was "as lenient as permissible" given the seriousness of the defendant's criminal conduct. Indeed,

if the district court had wanted to depart further it had ample room to do so.

This is not a case—as some are—where the district court expressed a desire to impose a lower sentence but thought itself blocked by a supposed legal barrier. *Compare United States v. Rivera*, 994 F.2d 942, 953 (1st Cir.1993). Here, the consecutive sentence was mentioned by the district court only after counsel for Webster sought to introduce it as a mitigating factor. The district court thought that it should not be so considered and was free to make this judgment. Accordingly we uphold the sentence.

## II. Bouthot

■ On February 18, 1994, Bouthot pled guilty to conspiracy to possess cocaine with intent to distribute, 21 U.S.C. §§ 841, 846. On July 1, 1994, after a one-day hearing, Bouthot was sentenced to 151 months' imprisonment. The district court found that Bouthot was responsible for 3.83 kilograms of cocaine, resulting in a base offense level of 30. The court also added two levels for Bouthot's supervisory role in the drug ring, and declined to make a downward adjustment for acceptance of responsibility. U.S.S.G. §§ 3B1.1, 3E1.1. With a total offense level of 32 and a criminal history category of III, the guideline sentencing range was 151 to 188 months, and the court chose the minimum.

The district court based the drug quantity on the testimony of Webster at Bouthot's sentencing hearing. Webster said that he provided Bouthot with one to three ounces of cocaine three times a month for 14 months, and made seven trips to New York with Bouthot to buy cocaine, each trip yielding six to twelve ounces of cocaine but with one trip netting a half kilogram. Using middle-to-low figures for the drug amounts, and adjusting for possible double counting for drugs from the New York trips subsequently given to Bouthot, the district court calculated that Bouthot was responsible for 3.83 kilograms.

Bouthot claims that Webster's testimony was an unreliable basis for establishing drug quantity. It is true that under U.S.S.G. § 6A1.3(a) information used for sentencing must have sufficient indicia of reliability to support its probable accuracy. *See United States v. Tavano*, 12 F.3d 301 (1st Cir.1993). Bouthot cites to a number of inconsistencies with Webster's previous accounts and points out that Webster was an admitted perjurer, a drug user, and a turncoat who received a substantially reduced sentence for implicating others.

Credibility assessments at sentencing are the province of the district court and are respected on appeal unless clearly erroneous. *United States v. Olivier–Diaz*, 13 F.3d 1, 4 (1st Cir.1993). True, Webster was a witness to be approached with caution; indeed, he had twice perjured himself in earlier proceedings before the district court. But these lies occurred before Webster had agreed to cooperate with the government. The district court was free to conclude that, once the game was up, Webster had wisely chosen to cooperate fully and truthfully with the government in the hope of receiving a lightened sentence.

■ Bouthot next argues that, even assuming the reliability of Webster's testimony, the mean "per transaction" figures used by the district court as multipliers lacked adequate evidentiary support; the court settled on two ounces as the per transaction amount for Bouthot's regular supply and eight ounces as the per trip amount for six of the seven New York trips. Webster had testified unequivocally that he gave Bouthot one to three ounces three times a month and that they purchased six to twelve ounces on their typical New York trip. Bouthot did not object to the district court's method of drug computation at the time of sentencing and therefore has waived this issue. *United States v. Uricoechea–Casallas*, 946 F.2d 162, 166 (1st Cir.1991). In any event, we review the district court's drug quantity determinations for clear error, *United States v. Morillo*, 8 F.3d 864, 871 (1st Cir.1993), and find no such error here. Where no drugs have been seized, the guidelines instruct the district court to approximate the amounts involved, U.S.S.G. § 2D1.1 comment. (n. 12), and we uphold such an approximation as long as it represents a reasoned estimate of quantity. *Morillo*, 8 F.3d at 871.

In this case, the figures chosen by the district court were the mean figure for the small buys and on the conservative side for the New York trips, and they were drawn from ranges with relatively tight margins. This case is quite unlike *United States v. Sepulveda*, 15 F.3d 1161, 1197 (1st Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994), where we found it error to use the midpoint between four ounces and one kilogram as the average transaction. All in all, we think that the figures chosen by the district court in this case represent a defensible estimate of drug quantity based on the available evidence, and this is all that is required. *Morillo*, 8 F.3d at 871. *See also United States v. Innamorati*, 996 F.2d 456, 490–91 (1st Cir.), *cert. denied*, 114 S.Ct. 409, 126 L.Ed.2d 356 (1993).

■ Bouthot also says that the district court erred in failing to award him a two-point reduction for acceptance of responsibility. Bouthot did plead guilty to the drug charge but a plea of guilty is not a guarantee for receiving the reduction. *United States v. Bradley*, 917 F.2d 601, 606 (1st Cir.1990). The district court found that Bouthot had understated his criminal involvement. This in turn warranted a finding that Bouthot had not fully accepted responsibility. *See* U.S.S.G. § 3E1.1 comment. (n. 1).

■ The two-level adjustment for Bouthot's role in the offense is also supported. Webster and a DEA agent both testified that Bouthot had recruited an individual named Conwell to sell small amounts of cocaine for him, paying Conwell a fixed commission on every sale and providing him with housing from which to operate. This testimony, accepted by the district court, is more than enough to qualify Bouthot for a two-point adjustment for exercising a leadership or supervisory role in the offense. *See* U.S.S.G. § 3B1.1 comment. (n. 4). *United States v. Fuller*, 897 F.2d 1217, 1219–22 (1st Cir.1990).

### III. Ravelo

■ Ravelo was convicted by a jury of conspiracy to possess cocaine with intent to distribute. On July 21, 1994, the district court sentenced him to 188 months' imprisonment. The court determined that Ravelo's base offense level was 34, based on a drug quantity finding of 198.1 grams of cocaine base, also known as crack. No upward or downward adjustments were made. With no prior criminal record, Ravelo's total offense level yielded a guideline sentencing range of 151 to 188 months, and the court sentenced him at the top of the range.

As with Bouthot, Webster was the primary witness at Ravelo's sentencing hearing. Webster testified that Ravelo was his New York source for cocaine and that he purchased on average 6 to 8 ounces twice per month from 1990 to 1993. Consistent with his testimony at Bouthot's sentencing hearing, Webster said that at times the amounts were upwards of 11 to 13 ounces and that once he purchased a half kilogram from Ravelo. Webster also testified that in the summer of 1993 he purchased from Ravelo seven ounces of crack made in Ravelo's kitchen.

At sentencing the district court accepted Webster's testimony and found that Ravelo had sold Webster seven ounces (198.1 grams) of crack in the summer of 1993. The crack finding alone placed Ravelo at a base offense level of 34. *See* U.S.S.G. § 2D1.1(c)(5). Ravelo, like Bouthot, claims that Webster's testimony was unreliable. But Webster was very clear about the crack transaction—how much was involved, who was there, and how it was made. This testimony was also consistent with what Webster had told law enforcement agents during his debriefing. For the reasons already set forth with respect to Bouthot, the district court was free to conclude that Webster's testimony was credible and sufficiently reliable.

■ Ravelo next claims that he should have been held accountable for no more than 1.26 kilograms of cocaine, because this was the amount for which Webster was sentenced, and both participated in the same transactions. Webster's sentence was based on 1.26 kilograms of cocaine, an amount computed by a probation officer and stipulated to by the parties at sentencing. The crack transaction is excluded from the stipulated amount but the discrepancy is easily explained.

Evidence of the crack transaction apparently first surfaced during Webster's debriefing by law enforcement agents. But before he spoke, Webster obtained a written promise from the government that none of the information he provided would be used against him (with exceptions not here relevant). Under the guidelines, this promise immunized Webster from having the crack transaction count towards his sentence. *See* U.S.S.G. § 1B1.8(a).

We see no problem with holding Ravelo responsible for the greater drug quantity actually proved at his sentencing hearing. First and foremost, he did not cooperate with the government and thereby receive immunity for the crack transaction. Although the guidelines generally seek uniformity in sentencing, they also encourage divergent treatment for those who cooperate, in order to promote greater cooperation with law enforcement. Given Ravelo's decision not to cooperate, he has no basis for complaining about leniency to someone who did cooperate.

 Ravelo's final challenge to his sentence relates to comments made by the district court at the time of sentencing pertaining to Ravelo's alien status. Ravelo, a citizen of the Dominican Republic, claims that the court's comments indicate that he was sentenced more harshly because of his alienage and that a constitutional violation resulted. *Compare United States v. Gomez*, 797 F.2d 417, 418–21 (7th Cir.1986) *with United States v. Leung*, 40 F.3d 577, 585–87 (2d Cir.1994) *and United States v. Borrero–Isaza*, 887 F.2d 1349, 1353–56 (9th Cir.1989).

The district court made clear that it was sentencing Ravelo to the high end of the guideline range because of his continued dishonesty and defiance. Ravelo's alien status was raised by Ravelo's counsel who requested a lighter sentence because as an alien, Ravelo would be subject to deportation upon his release from prison. The sentencing judge said, in substance, that Ravelo was not entitled to leniency simply because he faced deportation, for this would undermine the deterrent value of Ravelo's sentence. It is thus clear that the district court did not punish Ravelo more severely because of his alien status.

## IV. Huntington

 Huntington pled guilty to two counts of bank fraud, 18 U.S.C. § 1344, and one count of conspiracy to commit bank fraud, 18 U.S.C. §§ 371, 1344. The scheme involved the forging and cashing of blank checks stolen from a local health center; the checks were stolen by Webster, forged by Huntington and cashed by numerous individuals at various branches of the Casco Northern Bank on newly opened accounts. Apart from Webster's membership in both conspiracies, the bank fraud scheme was unrelated to the drug ring. Huntington pled guilty to the three fraud charges against him on December 6, 1993.

Some three months later, on the morning of his presentence conference, Huntington moved to withdraw his plea on the grounds of involuntariness; Huntington claimed that he had been threatened by two codefendants—by Webster and by Huntington's own nephew Stephen Huntington—to plead guilty or face physical harm. On April 29, 1994, the court held an evidentiary hearing on the plea-withdrawal motion, at which Huntington was the sole witness. At the hearing's conclusion, the court denied the motion, finding that Huntington's story was a blatant, last-minute fabrication.

The court sentenced Huntington on July 22, 1994. Huntington's conduct equated to an offense level of 11, which included a two-level increase for more than minimal planning. U.S.S.G. § 2F1.1(b)(2)(A). The court imposed a two-level upward adjustment for Huntington's organizational role in the scheme, U.S.S.G. § 3B1.1(c), and a further two-level upward adjustment for obstruction of justice, based primarily on Huntington's perjurious testimony at the plea-withdrawal hearing. U.S.S.G. § 3C1.1. With a criminal history category of III, the resulting guideline sentencing range was 24 to 30 months, and the court sentenced him to the maximum amount of 30 months.

In making an upward adjustment for Huntington's role in the offense, the district court found as follows:

8

[T]his defendant collaborated with Webster as to devise, carry out this scheme, forge and negotiate stolen checks, and that he typed false and fictitious amounts and information about the payees on several stolen checks. The Court further finds that he forged the authorized signatures and assisted Webster in giving instructions to other participants in the scheme, directing their efforts in the offense conduct.

Based on the first sentence of these findings, and on certain other comments made by the sentencing judge, Huntington argues that the district court misunderstood the legal standard and thought it enough that Huntington was extensively involved in the conspiracy. The guideline requires that Huntington must have controlled or organized the activities of at least one other participant in the bank fraud scheme. U.S.S.G. § 3B1.1(c); *Fuller*, 897 F.2d at 1220; *United States v. Castellone*, 985 F.2d 21, 26 (1st Cir.1993).

At sentencing the court specifically found that, in addition to playing a central role in devising the whole scheme, Huntington directed and instructed various individuals on how to negotiate the forged checks at the banks. While the former conduct provides evidence suggesting an enhanced role, *see* U.S.S.G. § 3B1.1 comment. (n. 4), the latter conduct conclusively establishes that Huntington controlled or organized at least one other participant.

The record supports this assessment. There was evidence that Huntington instructed an individual named Jolin how to present the forged checks for acceptance and directed him to different branches of Casco Northern Bank for that purpose. Steven Huntington, the appellant's nephew, testified at the sentencing hearing that the appellant recruited him to take part in the scheme and that the appellant "did all the talking" when distributing the forged checks to him and another check casher named Glantz. At the very least, Huntington served as Webster's lieutenant, and the guidelines do not limit supervision to one person. U.S.S.G. § 3B1.1 comment. (n. 4).

Huntington says that the role-in-the-offense enhancement amounts to impermissible double counting in view of the district court's earlier enhancement for more than minimal planning. The two-level increase for more than minimal planning was based on the fact that the bank fraud scheme involved repeated episodes of fraud; the two-level increase for role in the offense, as we have just discussed, was predicated on Huntington's direction and supervision of others. Because the two adjustments were based on separate factors, there was no double counting. *United States v. Balogun*, 989 F.2d 20, 23–24 (1st Cir.1993).

Huntington also contests the upward departure for obstruction of justice under U.S.S.G. § 3C1.1. In making this adjustment, the court relied upon three separate instances of alleged perjury, but any one is sufficient. *United States v. Tracy*, 36 F.3d 199, 201 (1st Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 609, 130 L.Ed.2d 518 (1994). We confine ourselves to the district court's finding that Huntington had testified falsely at the plea-withdrawal hearing when he claimed that he was "absolutely" innocent of the bank fraud charges.

Under *United States v. Dunnigan*, —— U.S. ——, ——, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993), a witness commits perjury if he or she "gives false testimony concerning a material matter with a willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." In *Dunnigan*, the Supreme Court instructed that a sentencing court must make independent findings necessary to establish the enhancement, preferably addressing each element of the alleged perjury in "a separate and clear finding." *Id.* at ——, 113 S.Ct. at 1117. Huntington argues that the court's findings are legally insufficient to support a determination of perjury under the *Dunnigan* standard. We disagree. On the first episode of perjury the court found as follows:

The Court bases its findings from the testimony of this defendant ... at the proceedings to determine whether he should be permitted to withdraw his guilty plea. The Court is satisfied that his disclaimer of participation in these offenses in this offense conduct at that time, his protestation of innocence [was] *false*, that that testimo-

ny related to a *material matter* and that it was *intended to influence* the judgment of the Court in making the determination as to whether he should be permitted to withdraw his plea of guilty. In that respect the Court is satisfied there was an obstruction of justice by this defendant. (emphasis added).

These findings encompass all the predicates for perjury and thus satisfy the requirements of *Dunnigan.*

As for the factual bases for those findings, the record amply supports the judge's ruling under the clear error standard. *Tracy,* 36 F.3d at 202. At the plea-withdrawal hearing Huntington testified that he was absolutely innocent of the bank fraud charges brought against him, claiming that he had been duped into signing the checks by Webster. But at sentencing four months later Huntington admitted his knowing participation in the bank fraud scheme, although not to the full extent for which the district court ultimately found him responsible. As such, Huntington's protestations of "absolute" innocence at the withdrawal hearing were not in any way ambiguous and amounted to perjury. *See United States v. Austin,* 948 F.2d 783, 789 (1st Cir.1991) (perjury committed at withdrawal hearing requires obstruction of justice adjustment).

For the foregoing reasons the sentences of all four appellants are *affirmed.*