USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1190 UNITED STATES OF AMERICA, Appellee, v. VALENTINE EKE, Defendant, Appellant. ____________________ No. 96-1191 UNITED STATES OF AMERICA, Appellee, v. OBINNA EGBOUDIKOGU, Defendant, Appellant. ____________________ No. 96-1320 UNITED STATES OF AMERICA, Appellee, v. ANTHONY NWOKEJI, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Richard G. Stearns, U.S. District Judge] ____________________ Before Torruella, Chief Judge, Campbell, Senior Circuit Judge, and Boudin, Circuit Judge.  ____________________ Alan D. Rose, by Appointment of the Court, with whom Rose & Associates was on brief for appellant Valentine Eke. John Salsberg, by Appointment of the Court, with whom Alan D. Campbell  and  Salsberg,  Cunha & Holcomb, P.C. were on brief for appellant Anthony Nwokeji. Richard E. Bachman, by Appointment of the Court, for appellant Obinna Egboudikogu. Deborah  Watson ,  Criminal Division, Appellate Section, Department of Justice,  with  whom  Donald K. Stern, United States Attorney, was on brief for the United States. ____________________ July 8, 1997 ____________________ BOUDIN,  Circuit  Judge .   Obinna Egboudikogu, Valentine Eke, and Anthony Nwokeji were indicted on charges of importing heroin  into  the  United  States, 21 U.S.C. S 952(a) and 18 U.S.C. S 2, and conspiracy to import, 21 U.S.C. S 963. Egboudikogu and Nwokeji pled guilty, and Eke was convicted following a trial. On appeal, Eke makes various claims of trial error, including  a  challenge to the sufficiency of the evidence. All three defendants dispute the district court's sentencing calculations. The defendants are Nigerian citizens who resided or did business in Boston or New York. According to the government, the  defendants recruited couriers to travel to Asia, where the couriers  would  receive  heroin and then return with the drugs to Boston. The government offered evidence concerning three specific importation efforts between August and November 1994 involving  different couriers. We describe the evidence in the light most favorable to the verdict. United States v. Smith, 46 F.3d 1223, 1226 (1st Cir.), cert. denied, 116 S. Ct. 176 (1995). In August 1994, Nwokeji and Egboudikogu offered to pay Lamaria  Hurt  $10,000  to  travel to Hong Kong and Singapore; they told her that she would bring back clothes and documents but that  no  drugs  would  be  involved. When Hurt agreed, Egboudikogu helped her obtain a passport, and Nwokeji and Egboudikogu provided her with an airline ticket. Hurt left Boston for -3- -3- Singapore in September 1994. She traveled on to Malaysia, where she ultimately received a bag whose lining was packed with a substance; at trial, she said that the substance was heroin,  although  she  did  not actually see it. Hurt returned to Boston on September 14 and gave the bag to Nwokeji and Egboudikogu, who said that Egboudikogu would be going to New York  "to  get  rid of the stuff." They later paid Hurt $10,000. Next,  in  late  September  or early October 1994, Nwokeji and Egboudikogu arranged a second trip, offering a woman named Bethany Dagen $10,000 to travel overseas. They helped Dagen obtain  a  passport  and  purchased her airline ticket. On October 9, Dagen flew from Boston to Hong Kong and then to Manila, where she received an oversized children's book. On October 28,  Dagen  was searched at Detroit airport, en route to Boston, when customs officials detected a powerful glue odor from the book.   They  found  229.9  grams of heroin concealed in the book's cover. Dagen was arrested and agreed to cooperate. Meanwhile, a third trip had been planned using a third courier, Mona Lisa Smith-Mixon. In October 1994, Egboudikogu and Eke went to a travel agency in New York, and Egboudikogu bought  an  airline ticket from Florida to Hong Kong in the name of a third person. Eke picked up the ticket several days later,  and  thereafter  requested two name changes on the ticket, each time paying a ticket-change penalty of $200. The travel agency finally issued the ticket to Smith-Mixon and delivered -4- -4- it  to  Egboudikogu.   Egboudikogu and Nwokeji offered Smith-Mixon $5,000 to make the trip and helped her obtain a passport, but Smith-Mixon ultimately refused to go.  As for Dagen, she returned to Boston after her arrest in Detroit and (at the direction of federal agents) arranged to meet with Nwokeji and Egboudikogu to deliver the children's book. On November 5, 1994, wearing a recorder, she met Egboudikogu in a Boston restaurant. Egboudikogu told Dagen that  she  had  not received all the heroin that she was supposed to get in Asia. He also said that his partner, who had just come from Houston, was waiting at a nearby Dunkin' Donuts store,  would  give her partial payment of her fee, and would be distributing the heroin in New York. When Egboudikogu started to leave the restaurant to get his  supposed  partner,  he  was arrested. Two agents then went to the nearby Dunkin' Donuts shop, where they saw Eke and questioned him. He was the only customer sitting at a table and a priority mail envelope from Houston, addressed to Eke, was sitting on his table. When Eke admitted that he had just been with Egboudikogu, he was arrested. Nwokeji was arrested later that evening. A  grand  jury  returned a three-count indictment, which set forth two substantive counts of drug importation or attempted importation (based on the trips by Hurt and Dagen) and one count of conspiracy to import, spanning the time from August -5- -5- 1994 until the defendants' arrests. Egboudikogu and Nwokeji were charged in all three counts; Eke was charged only in the Dagen  importation count and the conspiracy count. Egboudikogu and Nwokeji pled guilty to all counts and were each sentenced to  108  months' imprisonment. Eke was convicted on both counts by  a  jury  and was sentenced to 84 months' imprisonment. These appeals followed. 1. We begin with Eke's challenge to his conviction. At trial, Eke argued that he was an innocent businessman "whose only sin was associating with one of the conspirators [Egboudikogu] ." On appeal, he renews this claim, arguing that the evidence was insufficient to sustain his conviction. To prevail  Eke  must  show  that, viewing the evidence most favorably to the government, a rational jury could not have found him guilty  beyond  a  reasonable doubt. United States v. Valerio, 48 F.3d 58, 63 (1st Cir. 1995). Perhaps  the  strongest  single piece of evidence against Eke was Egboudikogu's statement to Dagen (recorded on audiotape) that his "partner" in the nearby Dunkin' Donuts shop would be distributing the heroin in New York and would provide Dagen with part of her payment for making the smuggling trip. The companion turned out to be Eke. As a threshold matter, Eke argues that this statement by Egboudikogu was inadmissible hearsay. -6- -6- The district court admitted the tape recording as a co- conspirator's statement. Fed. R. Evid. 801(d)(2)(E). That hearsay exception required the government to prove by a preponderance of evidence, apart from using the statement itself, that (1) a conspiracy existed between the declarant (Egboudikogu) and the defendant (Eke), and (2) the statement was  made  "during  and  in  furtherance of the conspiracy." United States v. Sepulveda, 15 F.3d 1161, 1180-82 (1st Cir. 1993), cert. denied, 512 U.S. 1223 (1994). The district court's findings of fact on both points are reviewed for clear error. Id. at 1180. If an importation conspiracy existed and included Eke, Egboudikogu's statements to Dagen about his "partner's" role were made during and in furtherance of the conspiracy: Egboudikogu's references to his partner were aimed at persuading Dagen to hand over the heroin-laden book so that delivery of the drugs to New York could be completed. See United  States  v.  Leal ,  831 F.2d 7, 9-10 (1st Cir. 1987). There was also considerable evidence, independent of the statement, suggesting that Eke was a member of the conspiracy. First, Eke accompanied Egboudikogu when the latter purchased  an  airline  ticket for travel to Hong Kong in the name of a third person, and Eke himself had the name on the ticket changed to Smith-Mixon, who had been recruited by Egboudikogu and  Nwokeji  to serve as a courier. In these dealings with the -7- -7- travel  agency,  Eke  twice  paid the $200 name-change fee in cash; and  in  each  case Eke gave the travel agency a modified version of his middle name, rather than his true last name. Eke also accompanied Egboudikogu to the meeting with Dagen and waited nearby.  Second,  the  government also presented evidence concerning several entries in Eke's pocket diary, which was seized upon his  arrest.   That  diary  listed the phone number of Nwokeji, who in  turn  had  Eke's pager number. Eke's diary also included the names of "Jeff Obi," an alias used by Egboudikogu when recruiting couriers; Anthony Isiamah, who allegedly served as a contact in Bangkok for Egboudikogu; and Beth Freeland, a friend of Dagen. While Dagen was in Manila on her trip, she had telephoned Nwokeji and Egboudikogu and asked them to send money to Freeland in order to pay Dagen's rent. Third,  the  operator of a New York business that sends and receives international calls for customers testified that Eke received  a  fax from Thailand sent by someone named "Chris." A Nigerian  also named "Chris" had delivered heroin from Bangkok, Thailand,  to  Manila,  where he gave it to Dagen concealed in the children's book. There was no further indication of the identity  of  the person who sent the fax or the contents of the fax. The evidence just described adequately supports the district judge's ruling, by a preponderance of the evidence, -8- -8- that  Eke  was  a  member  of  the conspiracy. This made the hearsay statement  admissible.   And, adding the hearsay statement to the evidence  just described, the cumulative evidence was more than adequate to permit a rational jury to conclude beyond a reasonable doubt that Eke was a member of the conspiracy and had participated in the Dagen importation. See United States v. Andujar, 49 F.3d 16, 21-22 (1st Cir. 1995). It is true that without the hearsay statement and the evidence  just described, Eke's mere presence at the restaurant showed very little. But with the additional evidence, Eke's presence could be viewed as a further step by him in the conspiracy,  in  addition  to his involvement with the Smith-Mixon ticket. As for the required element of intent to enter into the conspiracy, see Andujar, 49 F.3d at 22, Egboudikogu's hearsay statement identified Eke as a partner in the conspiracy, a statement consistent with the other evidence as to Eke's activities. Eke makes other claims of error regarding his conviction based on an alleged variance between the indictment and trial evidence, various evidentiary rulings, the district court's denial of his new trial motion, and the absence of minorities on the jury. We do not think any of these claims of error is arguably  close,  and  to  the extent that Eke seeks an explanation on those points, his claims are answered in the government's brief. -9- -9- 2. All three defendants challenge the district judge's calculation of drug quantity at sentencing. Under the Sentencing Guidelines, the base offense level for importing drugs depends on the total drug quantity involved in the offenses. U.S.S.G. S 2D1.1(c); id. comment. (n.12). The government must prove drug quantity by a preponderance of the evidence. United States v. Lindia, 82 F.3d 1154, 1161 (1st Cir.  1996).   The  district court's findings of fact are reviewed for  clear  error, and its legal rulings are considered de novo. Id. at 1159. The  only  drugs  seized  were the 229.9 grams of heroin found in the children's book carried by Dagen. Hurt entered the country without detection, and Smith-Mixon never took the planned trip. Nonetheless, following an evidentiary hearing, the district court found that the conspirators intended Hurt and  Dagen  each  to  import  400 grams of heroin, while Smith-Mixon was  intended  to import 200 grams--a total of 1,000 grams. The court  found  Eke  not  responsible for the Hurt trip, reducing the amount attributed to him to 600 grams. Under section 2D1.1(c), the kilogram charged to Egboudikogu  and Nwokeji gave them each a base offense level of 32;  Eke,  responsible  for  600 grams, had a base offense level of 28. Egboudikogu and Nwokeji received adjustments for their role in the offense and acceptance of responsibility. All -10- -10- three  defendants  were  sentenced within the applicable guideline ranges. On appeal, the only issues relate to the amount of drugs attributed to the individual defendants. At the outset, the defendants assert that no quantity whatsoever should be attributed to them based on the Hurt and Smith-Mixon transactions. Egboudikogu and Nwokeji say that Hurt may have been making a test run and carrying no heroin; but both defendants pled guilty to count 2 of the indictment, which  charged them with successfully importing heroin. As for the  aborted  Smith-Mixon trip, section 2D1.1 expressly includes in the attributed amount any drugs sought to be imported through attempts and conspiracies, even if the efforts were unsuccessful. See also U.S.S.G. S 2D1.1 comment. (n.12). The more difficult question is how to determine drug quantity  for  a transaction where no drugs are seized (Hurt and Smith-Mixon) or where the government says that the amount seized understates the scale of the offense (Dagen). Application note 12 to section 2D1.1 provides the starting point. It states: Where there is no drug seizure or the amount seized does  not  reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved. -11- -11- An approximation will be upheld "as long as it represents a reasoned estimate of quantity." United States v. Webster, 54 F.3d 1, 5 (1st Cir. 1995). It is apparent that some estimating methods (e.g., inventory  records)  are  likely to be quite reliable, and others- -such as computing drugs from sale proceeds--are reasonably accurate. Here, however, the government had no such data. Instead, at the evidentiary hearing, it called as a witness Peter Amentas, a federal customs agent familiar with heroin smuggling to the east coast of the United States and regarded as an expert by the government. In a companion affidavit, Amentas stated that since August 1994, fees paid to couriers importing heroin into the eastern United States have . . . remained stable. Over  that  period, couriers have been paid an average of between $1,000 and $2,500 per 100 grams of a mixture containing heroin (having a purity of approximately 75%) brought into the Eastern portion of the country. The  district  court  agreed to use the government's proposed approach.   The court cautiously selected the highest rate from the range identified by Amentas ($2,500 per 100 grams of heroin), thereby reducing the resulting drug quantity. Dividing this $2,500 figure into the fees paid or offered to the three couriers, the court concluded that the defendants intended Hurt and Dagen each to import 400 grams of heroin (since  each  had been paid or promised $10,000) and that Smith- -12- -12- Mixon was intended to import 200 grams (based on the offer of $5,000). Needless  to  say, the defendants say that the computations made by the district court are unduly speculative. They urge that Hurt had imported 229.9 grams for $10,000 and therefore the amounts attributed to the other two couriers should be computed  at  the  same  rate (about 60 percent of the rate adopted by the district court). On this calculation, the amount reflected by the total courier fees ($25,000) would be 574.75 grams, with Eke accountable for only 344.85 grams. At first blush,  this  might  appear  a reasonable estimating approach based on a transaction actually undertaken by the defendants. The difficulty is that the drugs seized from Hurt understated  the amount that she had been intended to carry--or at  least  it  was  reasonable for the district court to reach this conclusion. Egboudikogu told Dagen that she had not received as  much  heroin from the Asian suppliers as she was supposed to get; according to Egboudikogu, the supplier had to rush the order  because Dagen, already delayed many days, had hurried to return to the United States. The defendants' proposed calculation is premised upon this understatement. The district court is not required to prefer a less reliable  calculation  to  a more reliable one, and the guidelines themselves instruct that where "the amount seized does not reflect the scale of the offense, the court shall approximate -13- -13- the quantity." U.S.S.G. S 2D1.1 comment. (n.12). Yet a more reliable estimate is not automatically reliable enough: the question  remains whether the government's calculation here had "sufficient indicia of reliability to support its probable accuracy."   Webster ,  54  F.3d at 5 (citing U.S.S.G. S 6A1.3(a)). Here, the "indicia of reliability" was the experience of the government's witness, who said that he had worked on 200 heroin cases, and also had secured information from other officers. In 15 of the cases, Amentas acted in an undercover capacity and in many others he had interviewed the couriers. On this basis, Amentas testified to the payment range for couriers--$1,000 to $2,500 per 100 grams--engaged in similar transactions: importing comparably pure heroin from Southeast Asia to the U.S. east coast. In principle, drug courier services are a "market," like drug  sales,  and extrapolations based on street drug prices are commonly  used to determine drug quantity. E.g., United States v. Jackson, 3 F.3d 506, 511 (1st Cir. 1993). Quite possibly, the  price  for heroin couriers at a given time and location may vary more widely than for retail sales (simply because market imperfections are greater); and one may suspect that a direct linear  relationship between quantity and price is less likely. Indeed, Amentas readily admitted that courier payments varied for many reasons, including supply and demand changes and the experience and understanding of the courier. But he  -14- -14- testified  to  a payment range and said that this range had been steady for a considerable period. He was cross-examined extensively;  this  court  has reviewed the cross-examination, and nothing in it seriously undermined Amentas' testimony. The district judge, who has considerable latitude in this area, accepted it as persuasive. Our  case  law  requires caution in estimating drug quantity but, in the last analysis, an estimate of drug quantity is treated as a "fact." United States v. Sepulveda, 102 F.3d 1313,  1318  (1st Cir. 1996). Here, the district court credited the  government's  witness  on the figures used for the range, and the  court's  calculation  of quantity flowed rationally from that premise.   The court guarded itself by taking the lowest end of the  range  offered by Amentas. Compare United States v. Sklar, 920  F.2d  107,  112  (1st  Cir. 1990). On the record before us, we cannot say that the district court's estimate was clearly erroneous. The defendants have made other criticisms of the government's  evidence  at  sentencing and of the district court's calculations, but again, most of the remaining claims are addressed  in  the government's brief and none requires separate discussion.   Nwokeji points to mitigating circumstances in his own case, but the guidelines are largely driven by quantity, and he identifies no specific error by the district court in determining other adjustments. Affirmed. -15- -15-