# United States Court of Appeals
## For the First Circuit

No. 11-1064

UNITED STATES OF AMERICA,

Appellee,

v.

MOISÉS CANDELARIA-SILVA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Selya and Lipez,
Circuit Judges.

Judith H. Mizner, Assistant Federal Public Defender, District of Massachusetts, for appellant.
Justin Reid Martin, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Julia M. Meconiates, Assistant United States Attorney, were on brief for appellee.

May 13, 2013

**TORRUELLA, Circuit Judge.** This is a second appeal from the denial of Defendant-Appellant Moisés Candelaria-Silva's ("Moisés") motion for reduction of sentence under 18 U.S.C. § 3582 (c)(2) and the retroactively amended crack-cocaine guidelines. The first time around, the district court found defendant ineligible for a reduction, stating, without further explanation, that "[a]ny of the other narcotics [underlying this offense] standing alone substantiate[s] the [Offense Level] of 42 for which the defendant was convicted." United States v. Candelaria-Silva, 357 F. App'x 306 (1st Cir. 2009) (per curiam). Because the court's conclusion was not self-evident on the face of the record, we vacated that order on appeal and remanded for further proceedings. In so doing, we made plain that, under the applicable law, Moisés "may only be held responsible for those drugs he personally handled as well as those that were reasonably foreseeable to him." Id. at 307.

The district court reaffirmed its ruling on remand. It found that the quantity of heroin distributed by the conspiracy, of which Moisés was a member, was reasonably foreseeable to him and in itself sufficient to support the sentence imposed. Moisés contends that the district court's foreseeability finding and the drug quantity determinations underlying it were clearly erroneous. We agree.

## I. Background

Moisés was arrested in February 1995, along with more than 30 co-conspirators, for his part in a massive drug conspiracy, which had controlled a substantial share of the Puerto Rican drug market since at least 1988. At the height of its power, the conspiracy headed by Israel Santiago-Lugo ("Santiago-Lugo") controlled the drug trade in the northern half of Puerto Rico, generating millions of dollars in profits and waves of violent reprisals against their competitors.

Though he was more than a street-level dealer, Moisés was a comparatively young, minor player in the conspiracy. Evidence presented at trial supported a conclusion that for at least some period of time, Moisés controlled the conspiracy's drug point at Villa Evangelina, a public housing project in Manatí, Puerto Rico. Exactly when and for how long Moisés controlled Villa Evangelina is not clear. One former co-conspirator testified that he thought Moisés was working at Villa Evangelina in 1992 or 1993, but could not be sure.[1]

Beyond his involvement at Villa Evangelina, however, no evidence presented at trial explicitly tied Moisés to the conspiracy before 1992 or 1993. Testimony of co-operating co-conspirators at trial indicated that Moisés' mother and his older

---

[1] Moisés apparently became the head of the Villa Evangelina point after the incarceration of his older brother in 1993.

brother Eulalio had been stashing and packaging drugs in the Candelaria-Silva's family home for several years, but no evidence of record directly linked Moisés to those activities.

As relevant here, at trial, the government presented two ledgers that the police had seized from a co-conspirator during a search of an apartment in Virgilio-Dávila. An FBI cryptanalysis expert testified that the ledgers spanned from October 1990 to October 1991, and detailed, in units, the quantity of drugs supplied over that time-span by the Santiago-Lugo organization to several drug points. No mention of Moisés, his family members, or Villa Evangelina was made in the ledgers.

Co-operating co-conspirator Marcos Hidalgo-Meléndez ("Hidalgo"), who had been in charge of cocaine distribution in Los Murales, testified to the use of the ledgers by the Santiago-Lugo organization as well as to the quantities of drugs reflected therein. Another co-operating co-conspirator, Carlos Otero-Colón ("Otero"), testified that he delivered cocaine to the Candelaria-Silvas to be packaged before it was sold at Hidalgo's point in Los Murales. He also testified that, "at some point," after one of his deliveries to the Candelaria-Silvas, he attempted to open his own drug point in Vega Baja, Puerto Rico, and that his transactions in relation to those efforts were recorded in the ledgers.

The jury found Moisés guilty of conspiracy to possess with the intent to distribute fifty grams or more of cocaine base,

-4-

five kilograms or more of cocaine, one or more kilograms of heroin, and an undetermined quantity of marijuana, in violation of 21 U.S.C. §§ 841 and 846.[2] Moisés was also found guilty of possession with intent to distribute cocaine base, cocaine, heroin, and marijuana. At the sentencing hearing, the district court found a base offense level of 38, and added two two-level enhancements due to Moisés' use of a firearm and his role as a supervisor, resulting in a total offense level of 42. He received a 30-year incarcerative sentence.

Following the 2007 Amendments to the Sentencing Guidelines, which reduced the crack/powder disparity, Moisés petitioned for re-hearing and was denied without explanation. He appealed to this court, and in a per curiam opinion, we remanded to the district court, with instructions to provide an explanation for its conclusions.

On remand, the district court concluded that Moisés was not entitled to a sentencing reduction because of evidence on the record supporting a conclusion that he had possessed enough heroin to warrant a base offense level of 38, regardless of any change in the crack-related guidelines. The district court reached this finding through combining two pieces of evidence in the record --

---

[2]   All co-conspirators who opted to go to trial were also found guilty. Some, including Moisés, appealed their convictions, which we affirmed. See United States v. Candelaria-Silva, 166 F.3d 19 (1st Cir. 1999).

the ledgers recovered by the police and trial testimony explaining the contents of the ledgers.

According to the testimony of the FBI's cryptanalysis expert, the ledgers recorded the sale of 28,208 units of 'c', 7,802 units of 'r', 753 units of 'a', and 9,535 unidentified units. Co-conspirator Hidalgo testified that the 'c' was heroin and 'r' was cocaine and that the units were packets. He further testified that there were 50 packets in 1/8 of a kilogram of cocaine (or 400 packets in a kilogram).

Hidalgo's critical testimony relating to the quantity of heroin in a packet, however, was less clear and possibly marred by prosecutorial error. Hidalgo testified that 100 packets of heroin were sold at a certain drug point every week. The prosecutor then asked him, without foundation:

> Q: Did you nevertheless find out how much he would pay for that eighth of a kilogram that you previously stated was sold every week at the Los Murales housing project?
>
> A: I was aware, I had knowledge, that at that point in time the eighth of a kilo of heroin was being sold in the market for $28,000.

Even though Hidalgo's answer assumed a fact not otherwise in evidence, the district court decided to credit this response as an affirmation of the prosecutor's statement that 1/8 of a kilogram of heroin was being sold at Los Murales every week. Combining this with Hidalgo's previous testimony that 100 packets had been sold every week, the district court concluded that 100 packets of heroin

-6-

equaled 1/8 of a kilogram. The court reached this conclusion despite noting that Hidalgo had earlier testified that each packet sold for $75, which, assuming a $28,000 market price for 1/8 of a kilogram of heroin, would suggest that there were closer to 400 packets in 1/8 of a kilogram. Indeed, the district court explained in a footnote that it believed that Hidalgo had made a mistake in his testimony and that he had meant to say that one <u>kilogram</u> of heroin sold for $28,000.

Using the 100 packets as an equivalency for 1/8 of a kilogram of heroin, the district court divided the 28,208 units of 'c' by 100 to get the number of kilograms sold, and then divided again by eight to conclude that for the period October 1990 - October 1991, the conspiracy-wide total quantity of heroin was 35.26 kilograms.

From the testimony of co-conspirator Otero that he had delivered drugs to the Candelaria-Silva's family home at some point, which may have been during the period reflected in the ledgers, the district court concluded that Moisés had been involved in the conspiracy at this time and the entire quantity of drugs was "reasonably foreseeable" to him.

Reasoning that 30 kilograms of heroin alone is enough to trigger a base offense level of 38 "and because it was obvious to all involved that the immense quantities of drugs distributed over this seven-year conspiracy justified a base offense level of

-7-

thirty-eight," the court concluded that Moisés was not eligible for a sentence reduction. This appeal promptly ensued.

## II. **Discussion**

The two-step analysis a district court uses to determine whether to grant a sentence reduction under § 3582(c)(2) is straightforward. See, e.g., Dillon v. United States, ___ U.S. ___, 130 S. Ct. 2683, 2691 (2010). The court begins by determining "the prisoner's eligibility for a sentence modification and the extent of the reduction authorized." Id. At this first stage, the court considers whether it has the legal authority to grant the reduction requested; thus, its conclusions of law are reviewed de novo, and its factual findings, for clear error. See United States v. Fanfan, 558 F.3d 105, 107 (1st Cir. 2009); see also United States v. Davis, 587 F.3d 1300, 1303 (11th Cir. 2009); United States v. Johnson, 569 F.3d 619, 623 (6th Cir. 2009). Next, at the second step, the court determines "whether the authorized reduction is warranted, either in whole or in part, according to the factors set forth in [18 U.S.C.] § 3553(a)." Dillon, 130 S. Ct. at 2691. Decisions at this stage are reviewed for abuse of discretion, as the question whether to reduce a final sentence pursuant to § 3582 (c)(2) "is a matter [Congress] committed to the sentencing court's sound discretion." United States v. Aponte-Guzmán, 696 F.3d 157, 159-61 (1st Cir. 2012).

-8-

Moisés' appeal revolves around the factual findings underlying the district court's eligibility determination. The clearly erroneous standard is therefore the compass that guides our review. The scope of our task is well settled: a reversal on clearly erroneous grounds is in order "when . . . the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United Gypsum Co., 333 U.S. 364, 395 (1948). Such is the case, for example, when the district court fails "to synthesize the evidence in a manner that accounts for . . . gaps in a party's evidentiary presentation." Doe v. Menefee, 391 F.3d 147, 164 (2d Cir. 2004). Likewise, reversal for clear error is warranted "where the trial court incorrectly assessed the probative value of various pieces of evidence, leading it to rely on speculation . . . ." Id. (citing United States v. Rizzo, 349 F.3d 94, 100-02 (2d Cir. 2003)); see also United States v. Marrero-Ortiz, 160 F.3d 768, 779-80 (1st Cir. 1998) ("While we may agree with the government that the [conspiracy] did a substantial amount of narcotics business, and that the totals necessary for a [drug quantity finding] seem attainable given the appellant's role in the conspiracy, we cannot uphold a drug quantity calculation on the basis of hunch or intuition.").

Applying this standard to the record before us, we find clear error in the district court's factual finding that the

quantity of heroin reflected in the ledgers was reasonably foreseeable to Moisés. The district court reached that conclusion without addressing troublesome evidentiary gaps, all of which Moisés underscores.

For example, among other things, the ledgers nowhere mention (either explicitly or in code) Moisés, his family, or the drug points attributed to them. In fact, trial testimony from a government's expert established that not a single ledger entry could be attributed to Moisés. Similarly, no evidence of record shows that Moisés participated in any way in the preparation of the ledgers. Nor is there any evidence directly linking Moisés, his family, or the Villa Evangelina project to the co-conspirators from whom the ledgers were seized. And the housing project where the seizure occurred was a long distance away from the Candelaria-Silvas' home base in Manatí. Last but not least, the ledgers covered transactions occurring between 1990 and 1991, a period during which Moisés' brother was the leader of the Candelaria-Silvas' drug operation. Although Moisés apparently took over business at Villa Evangelina after his brother's arrest in 1993, no evidence of record shows what Moisés' role in the conspiracy was when the transactions recorded in the ledgers took place. We thus agree with Moisés that "there is nothing in the contents of the ledgers or the circumstances of their seizure to suggest that [he]

was aware of them or to support attributing the quantities they referenced to him."

The government interprets the record differently. From its vantage point, "the record establishes that Moisés was a high member of the Santiago-Lugo organization [who] fully participated in the drug trade . . . [and enjoyed] a position of trust and cooperation with other members of the . . . drug conspiracy." The government offers four factual assertions in support: (1) that Moisés became the leader of the Villa Evangelina drug point after his brother's arrest in 1993; (2) that the Candelaria-Silvas packaged drugs received from Virgilio-Dávila for sale in Los Murales; (3) that Santiago-Lugo himself offered protection to Moisés in connection with a personal feud with people from another residential project;[3] and (4) that Santiago-Lugo's brother, who was married to Moisés' sister, would help from time to time at the Villa Evangelina drug point. The government's factual proffer, however, falls far short of satisfying the applicable burden.

For sentencing purposes in a drug-distribution conspiracy conviction, aside from his or her own acts, a defendant is accountable only for "all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that

---

[3]  At some point during the drug conspiracy, Moisés was kidnaped and robbed while visiting a drug point at a neighboring residential project.  Santiago-Lugo thereafter told Moisés that he would be nearby if needed.

-11-

he jointly undertook." U.S.S.G. § 1B1.3, cmt. (n.2). This means that the sentencing court must "ascertain on an individual basis the scope of the criminal activity that the particular defendant agreed jointly to undertake." United States v. Carrozza, 4 F.3d 70, 76 (1st Cir. 1993); see also United States v. Cruz-Rodríguez, 541 F.3d 19, 32 (1st Cir. 2008) ("When making the individualized finding of drug quantity responsibility, the court must not automatically shift the quantity attributable to the conspiracy as a whole to the defendant."). Specifically, the record must show the defendant's "level of involvement so as to explain why the nature of the conspiracy or his relationship with the leaders of the conspiracy showed he could foresee a given quantity of drugs." United States v. Correy, 570 F.3d 373, 388 (1st Cir. 2009) (emphasis in original).

The immense size of Santiago-Lugo's organization was a matter thoroughly discussed during the trial against Moisés and its other members. At Moisés' sentencing hearing, the size of the conspiracy played a major role in the court's analysis: "[a]fter considering the immense size of this drug-trafficking conspiracy, comprising so many members and various kinds of drugs distributed throughout the northern half of the island, it was not difficult for the experienced eye of the trial judge to arrive at a [base offense] level of thirty-eight." The record shows that, within Santiago-Lugo's vast drug-trafficking network, the Candelaria-

Silvas played a discrete role through their activities at Villa Evangelina and Los Murales. The record also shows that in 1993 Moisés may have succeeded his brother as the leader of the Villa Evangelina drug point. But other than these facts, the record is devoid of any evidence from which we could explain why Moisés' seemingly discrete role within Santiago-Lugo's "immense" organization put him in a position to foresee the quantities of drugs handled by it. See United States v. Willis, 49 F.3d 1271, 1274 (7th Cir. 1995) ("[I]t is highly questionable to leap from one person's knowledge that the organization is big to knowledge of its full scope. The district judge must take a closer look at this subject."). Nor does the record show that Moisés was privy to any information from which he could foresee the drug quantities that Santiago-Lugo's organization handled. While Moisés and Santiago-Lugo appear to have had some personal ties, more is necessary to show that the drug quantities involved in the conspiracy were foreseeable to Moisés. See Correy, 570 F.3d at 388 (noting that a drug-conspiracy sentence premised solely upon the defendant's familiarity with the leaders of the conspiracy "goes against our instruction to base individualized drug finding on a review of the record"). The government's proffer does little to address these types of concerns. We thus discard its contentions on this front as insufficient.

Similar problems afflict the district court's factual conclusions about the quantity of drugs recorded in the ledgers. We have stated on previous occasions that where, as here, a drug quantity determination relies on multiples of averages or extrapolations, the sentencing court must be mindful of "the potential for error where one conclusory estimate serves as the multiplier for another (i.e., average number of transactions per hour and average operating hours per day) [, which] may undermine the reasonable reliability essential to a fair sentencing system." United States v. Rivera-Maldonado, 194 F.3d 224, 233 (1st Cir. 1999); see also United States v. Sepúlveda, 15 F.3d 1161, 1198 (1st Cir. 1993) ("[T]he two flawed findings feed on each other; by using not one, but two, unsupported averages to arrive at both the number of trips undertaken and the amounts of cocaine handled in the course of each trip, the court compounded the error of its ways."). Accordingly, in sentencing a defendant convicted of participation in a poly-drug conspiracy, "care must be taken to ensure that particularized drug-type quantity findings are predicated on reliable information and, where significant uncertainty exists, that those findings err on the side of caution." Rivera-Maldonado, 194 F.3d at 233-34 (concluding that drug quantity determination was clearly erroneous where "the risk of error was compounded by pyramiding unreliable inferences"). In other words, sentencing judges may rely "on reasonable estimates and averages, "id. at 228,

-14-

but not on drug quantity calculations based on "hunches and intuition," Marrero-Ortiz, 160 F.3d at 779-80.

Here, the district court based its determination that there were 100 "packets" in 1/8 of a kilogram of heroin on testimony that assumed a fact not in evidence, that the district court acknowledged was inconsistent with prior testimony, and that the district court concluded was probably actually mistaken. These numbers are not the sort of "reasonable estimates and averages" that can or should be used as the foundational multiplier when making a drug-quantity determination. The risk of error inherent in these loose calculations is simply too high. As such, we conclude that the district court's drug quantity calculation was also clearly erroneous.

The government argues in the alternative that, even if Moisés was eligible for a sentence reduction, the district court would have found the § 3553(a) factors to preclude the relief sought. The district court, however, explicitly declined to consider § 3553(a) given its ineligibility finding; therefore, we are not in a position to make any determinations in this regard. See Aponte-Guzmán, 696 F.3d at 159-61 (stating that the balancing of § 3553(a)'s factors is "committed to the sentencing court's sound discretion"); see also United States v. Cardosa, 606 F.3d 16, 22 (1st Cir. 2010) ("Cardosa is eligible for resentencing; whether

to do so is within the discretion of the district judge on remand.").

## III. Conclusion

For the reasons stated above, we vacate the court's judgment and remand for further proceedings. In so doing, we note that despite the considerable amount of resources and time spent in addressing Moisés' motion, the record twice presented to us contains scant evidence from which to conclude that Moisés is ineligible for the relief requested. On remand, therefore, the parties as well as the court would be well advised to move beyond the eligibility question and squarely address the second step of the applicable analysis -- that is, determining whether the "reduction is warranted, either in whole or in part, according to the factors set forth in [18 U.S.C.] § 3553(a)." Dillon, 130 S. Ct. at 2691.

We have the utmost confidence in the district court judge's ability to adjudicate Moisés' motion fairly and objectively. We understand that district court judges retain considerable discretion in fashioning an explanation of their sentencing decisions. However, given the unusual circumstances of this case (a second remand because of errors in the district court's handling of the resentencing decision), we cannot emphasize more strongly the importance of the district court's duty to

provide detailed support for both its factual and legal conclusions.

**So Ordered.**